In re RODGERS.*

(Circuit Court of Appeals, Seventh Circuit. April 22, 1903.)

1. BANKRUPTCY—JURISDICTION OF COURT—DISTRIBUTION OF FUND.

Where a receiver appointed by a court of bankruptcy obtained peaceable possession of property from the bankrupt, although a warehouse company claimed to be in the actual possession, and had issued receipts therefor to the bankrupt, who had transferred the same, and such property was afterward sold by order of the court, to which the holders of the warehouse receipts agreed by stipulation, the property and its proceeds passed into the custody of the court, which had jurisdiction to determine the ownership of the fund.

2. WAREHOUSEMEN—VALIDITY OF RECEIPTS—PROPERTY NOT IN POSSESSION OF WAREHOUSEMAN.

A bankrupt was a dealer in seeds, occupying premises for which he paid a large rental, where he maintained his office and transacted his business, and in which he also stored the grain and seeds purchased by him, largely on credit. He made a contract with a storage company by which he gave it a lease of the premises without consideration, and the company issued to him warehouse receipts for the seeds therein, which he hypothecated as security for loans. The bankrupt continued to occupy the building as before. No sign was placed thereon showing possession by the storage company, which had no key thereto, and the only thing done to give notice of its possession of the seeds for which it

* Rehearing denied October 6, 1903.

had given receipts was to place small and inconspicuous signs in the rooms and small tags on the piles of bags containing such seeds. The bankrupt continued to treat the property as his own, cleaning the seeds, and in some cases selling them, and substituting other seeds for those covered by the receipts, although it did not appear that the storage company knew of such action. *Held*, that there was no such delivery or change of possession as to constitute in fact a warehousing of the property, but that under the law of Illinois, by which secret liens are invalid, the transaction was constructively fraudulent and voidable by creditors of the bankrupt.

**8. PLEDGES—VALIDITY—DELIVERY OF WAREHOUSE RECEIPTS.**

To constitute a valid pledge of property by the transfer of warehouse receipts therefor as security, such receipts must have been issued by one having the actual possession of the property, so that their transfer amounts to a constructive delivery.

**4. BANKRUPTCY—EFFECT OF PROCEEDINGS—RIGHTS VESTING IN TRUSTEE.**

The filing of a petition in bankruptcy is not merely an appropriation by the bankrupt of his property to the payment of his debts, but the trustee appointed thereunder is vested not only with title to the property and all the rights of the bankrupt therein, but also with the rights of action of creditors with respect to property which has been fraudulently transferred or incumbered by him.

**5. SAME.**

The filing of a petition in bankruptcy, followed by an adjudication, is a seizure of the property by the law which is equal in rank to seizure on attachment or execution, and with respect to the right to attack transfers or incumbrances by the bankrupt as either actually or constructively fraudulent the trustee stands in the same position as an attachment or execution creditor.

Appeal from the District Court of the United States for the Northern District of Illinois.

Alexander Rodgers was adjudged a bankrupt on May 8, 1901, and on that day the Chicago Title & Trust Company was appointed receiver, and subsequently trustee, of the property and estate of the bankrupt, and took possession of the estate, including the property hereinafter mentioned. The bankrupt was a dealer in seeds, having his place of business upon the premises Nos. 220 to 230 Johnson street, in the city of Chicago. These premises, consisting of the south half of the basement, the north half of the south half of the second, third, fourth, fifth, and sixth floors, with the right of way to the south elevator from the railroad platform by way of the east door on platform, and by way of entrance on alley, and the right of way to go upon the elevator, and the right to ship in and out by wagons by the front door, by chute, and by the rear entrance, as described, were leased by him from one Hascall from January 10, 1899, to April 30, 1902, at a monthly rental of $200. On November 28, 1899, he also leased until April 30, 1902, the south one-fourth of the fifth and sixth floors, at an additional rental of $50 per month. So that after that date he had the whole of the south half of the fifth and sixth floors, the north half of the south half of the second, third, and fourth floors, and the whole of the south half of the basement; the first floor being vacant, and used as a passageway. A wooden partition separated the south half from the north half of the floors of the building, the latter being occupied by another tenant. The entrance was from the west front of the building on Johnson street to the main floor, and thence stairways at the south end of the building ran from each floor to the floor above and to the basement. The front of the south half of the second floor was partitioned into an office, and was occupied by the bankrupt. There were also machinery and appliances and a freight elevator for the handling of seed, and on certain floors were bins with cleaning machinery for cleaning and grading seed. The seed was usually received from railroad cars into the basement; thence ele-

¶ 4. See Bankruptcy, vol. 6, Cent. Dig. §§ 222, 273.

vated to the top floor, if to be dumped or cleaned; and was usually received and shipped in bags, most of the business being in car-load lots of about 250 bags, and when stored on any floor was usually in car-load lots. The usual pile or lot was made up in two tiers of bags lying horizontally, the ends of the bags of one tier abutting the ends of the bags of another, with five or six bags piled up in front against the two tiers. These piles were about 16 feet long and 6 to 7 feet high. The building was known as "mill construction"; that is, the timbers were exposed posts supported by joists and girders. The various floors were known as divisions from the sixth down, A, B, C, D, E, and F; the latter being the basement. Depending from the ceiling girders or joists were wooden signs on which were painted "Div.," with the letters "A" "B," etc., indicating the floor, and "Sec.," with a number thereafter, as 1, 2, 3, etc., to indicate a section, so called, of the floor. The floors were large open floors, 50 by 90 or 60 by 100 feet, and had no bins for the separate storage of seed, and had no partitions dividing the floor space. The boundary lines of "sections" were imaginary lines, the signs being put up by Rodgers upon his leasing the premises; and there was no division of sections on the second floor, where a large part of the seed now in controversy was located.

The National Storage Company is a corporation, incorporated under the laws of the state of Illinois on December 29, 1886. It was authorized to carry on a general warehouse business, to receive for safe-keeping or storage general merchandise, grain, etc.; to take charge of and perform the duty of paying freight charges, duties, etc., on bonding, receiving, landing, hauling, and delivering such property deposited, or intended to be deposited with such corporation; to issue receipts or certificates for goods and personal property to the owner or owners thereof when such goods and personal property "have been received, are on the premises, or under the control of the said corporation at the time of issuing such receipts or certificates."

On August 25, 1900, the National Storage Company and the bankrupt entered into the following written agreement:

"Proposal for Warehousing.

"Office of National Storage Company,

"Chicago, Ills., August 25th, 1900.

"Mr. Alexander Rodgers,

"#220 Johnson Street, Chicago, Illinois.

"Dear Sir: 1. The National Storage Company hereby proposes to issue its storage warrants to the order of yourself or to such order as the acceptor hereof may hereafter direct, upon personal property consisting in part of Field Seeds to be stored in the premises known as #220-#230, Johnson Street, Chicago, Illinois.

"2. All of the above named premises, or such portions thereof as may from time to time be required, shall as and when required be leased to the National Storage Company. Said premises are to be designated as National Storage Company's Warehouse Premises Number 281.

"3. Rates, Terms and Conditions which shall govern the storage of property or issue warrants under this proposal are as follows:

"On property valued at $10,000 or less, the charge for the first calendar month or fraction will be $7.50, for each succeeding month or fraction $7.50, and for each additional $1,000 or fraction, the rate will be $.75 per month.

"All traveling expenses and other incidental expenditures incurred while conducting the business under this proposal, and all costs of placing property in store, such as measuring, weighing, tallying, surveying, platting or drafting, etc., will be added to above charges. A certified memorandum must be rendered, showing market value of the property placed in store on which storage charges are to be based.

"4. Substantial fences, gates, partitions, doors or other forms of enclosure, for enclosing or protecting property, for which warrants of this Company have been or may hereafter be issued, shall be constructed and kept in repair by acceptor hereof, and if not so constructed or repaired upon request, this Company is hereby authorized to forthwith construct or repair same, and place any cost therefor as a charge against the property enclosed or protected thereby.

"5. Any and every lease executed in pursuance of this proposal shall, upon written notice delivered to the National Storage Company by the acceptor hereof, be duly cancelled and the premises surrendered only when and after all warrants issued under, upon or by reason of any and every application executed by such acceptor, shall have been delivered to this Company under terms and conditions of this proposal and said warrants.

"6. It is understood unless otherwise provided in writing, that this proposition under its terms contemplates, that the quantity of grain which may be received for storage, shall be determined by a measured bushel standard. Grain will be received by weight and so accounted for, charges for weighing by this Company's representative to be paid by acceptor hereof.

"7. Storage charges are due and payable as elected by this Company, at time of delivery, monthly, or at close of each calendar quarter. It is provided, that if for any cause delivery of property be made on which storage charges have not been paid, the remaining property will be held liable for same and all other charges which may have accrued. The costs for delivery of property when attended by superintendence of this Company are not rated as storage charges. Such cost and other contingent expenses will form basis for additional charge. Surrender of warrants and payment of charges to date of such surrender will not cease or terminate storage charges until property has been accepted, and Release Permits have been signed by party authorized to receive the property surrendered, and permits have been received at office of this Company.

"8. Should increased cost, or additional services, or risk, in reference to said property or warrants, be incurred by reason of the sale or pledge of the warrants, and the property, covered thereby, then the rates on each warrant, shall be such as shall be fixed by this Company, not exceeding the rates named therein.

"9. The services of a capable person satisfactory to this Company must be provided to represent its interests, such person shall also be acceptable to any surety company from whom indemnity bond may be asked in adequate amount, and commensurate with value of property received by this company and covered by its warrants. To defray cost of bond and services of such custodian a charge against the property will be made, unless otherwise adjusted.

"10. This Company reserves the right to recall and issue new warrant, for remainder of any warrant having three or more endorsements thereon of property delivered therefrom, also to recall and issue new warrant for remainder of any warrant, at expiration of one year from its date, having one or more endorsements thereon of property delivered therefrom, provided that in either case the guarantee afforded by endorsers is not affected thereby.

"11. It is understood that while the identity of each respective lot of property received by this Company, shall always be maintained, any surplus remaining after the delivery of any certain lot or lots may be retained by the Storage Company, until all charges are paid, and all warrants issued in pursuance of this proposal shall have been surrendered and satisfied.

"12. It is to be understood also, that should this Company at any time hereafter, for any reason deem the premises furnished for its occupancy insecure for its purposes, or, for any cause be interfered with in the possession or removal of property covered by its warrants, or be dispossessed of the storage premises, which are now or may hereafter be leased to it, that it is hereby authorized, without notice to holders of warrants upon all or any part of the property stored in such premises, to provide other suitable storage premises, move the property thereto, and cause policies of insurance to issue thereon to its own order in trust for amount of value shown by said valuation memorandum, or more at its discretion. All costs or expenses accruing by means of such removal, interference or dispossession, including insurance premiums, and increased rental paid by this Company, for space occupied by such property, shall be chargeable against the property in addition to the storage rate above specified. And if the same or any other charges are and remain unpaid for ninety days° or more, this Company is hereby authorized to sell the property in the manner, legally provided for enforcing warehouse-men's lien, and shall apply the proceeds of such sale:

"First: To the payment of all costs and expenses of such sale.

"Second: To the payment of all sums due this Company under, upon or by reason of this proposal, and the overplus if any, shall be held for and upon demand paid to the party or parties legally entitled thereto. When this Company shall have given the legal notice and sold the property as provided thereunder; then all warrants affected thereby shall be null and void as against the National Storage Company.

"13. The Property delivered for purposes of storage must remain undisturbed until warrants covering same are surrendered, received at office of this Company in Chicago and 'Release Permits' duly received and countersigned by Custodian in charge and receipt signed for property by party authorized to receipt for same.

"14. The acceptance hereof shall empower The National Storage Company to place its signs and marks upon the property and enclosure to such an extent as shall fully protect possession in compliance with laws regarding same, which signs and marks must at all times remain undisturbed and unobscured.

"15. Upon conclusion and settlement of all business under this proposal, all copies of original and duplicate papers, shall, upon request of this Company be cancelled and returned to it.

"Very respectfully,  National Storage Co.,
"Accepted.  By Walter Tod, Treasurer.
"Alex. Rodgers."

And thereupon the bankrupt executed a lease to the National Storage Company as follows:

"This Agreement, Made this thirty-first day of August, in the year of our Lord one thousand nine hundred ——— between Alexander Rodgers, of Chicago, County of Cook, and State of Illinois, party of the first part, and National Storage Company, a corporation organized and existing under the laws of the State of Illinois, party of the second part,

"Witnesseth: That the said party of the first part for and in consideration of the covenants and agreements hereinafter mentioned and contained, to be kept and performed by the said party of the second part, its successors and assigns, hereby does demise, lease, and let unto the said party of the second part the following described premises, situated in the City of Chicago, County of Cook and State of Illinois, to wit:

"All of the basement and second floor, the North Half (N. ½) of the third (3) and fourth (4th) floors and all of the fifth (5th) and sixth (6th) floors of the six (6) story and basement Brick Building situated at and known as #220 #222 #224 #226 #228 and #230 Johnson Street, for and during the term of three years from and after the date of this Agreement (and so long thereafter as property remains thereon for which warrants of said Storage Company have been issued and are in force and effect) for a yearly rental of One Dollar, and other good and valuable considerations, the receipt of which in advance, is hereby acknowledged by the party of the first part.

"This lease is made upon the express conditions following, to wit:

"First. That the said leased premises shall be used and occupied exclusively for the storage of Personal Property, and for the transaction of such other business as may be connected therewith, or incident thereto, in pursuit of any rights claimed in performance of duties of said Storage Company as Warehousemen.

"Second. That the said second party will not receive upon premises above described any property for purposes of storage, after due notice in writing has been received by said Storage Company, from said first party, that termination of this lease is desired.

"Third. Said party of the second part its agent or agents shall, for the purpose of inspection or removal of any property which may be located in premises herein leased, be permitted easy and convenient passage at any and all times; through any part of the abutting premises that is or may hereafter be occupied or controlled by said party of the first part.

"Fourth. Said party of the second part shall, for the convenient moving of property to or from the above described premises, have free from cost of

operation the use of elevators, tracks, cars, scales, scale house and any other fixtures or appliances that party of first part now has or may acquire during term of this lease, and shall be privileged to place any marks, signs or other evidences of possession which it may deem necessary or desirable.

"Fifth. It is understood and agreed to by and between the parties hereto that the 'moving of property' shall include the complete delivery of same on cars, wagons, or other means of transfer should party of the second part so elect.

"In Witness Whereof, the parties to these presents have hereunto set their hands and seals the day and the year first above written.

"[L. S.]                              Alexander Rodgers          [Seal.]
"[L. S.]                              National Storage Company   [Seal.]
                                                "By Walter Tod."

Upon the execution of the lease the National Storage Company tacked on the walls of the several floors notices in white letters upon dark blue enameled tin 3x7 inches, there being eight of the signs, which were distributed to the several floors of the building. These signs read: "This property controlled by the National Storage Company as a public warehouse. Warehouse premises No. 281." These signs were placed seven or eight feet from the floor on the side of the building and on the partitions between the premises in question and the north half of the building; but no signs were placed on the exterior of the building. When the bankrupt desired a storage warrant, he made application upon a blank form to the National Storage Company as follows:

"Application for Storage Warrant.

"Chicago, Ill.

"To the National Storage Company,
                              "Chicago.

"For the purpose of obtaining your Storage Warrants the subscriber has placed in your Warehouse premises No. 281, located at Nos. 220–230 Johnson St. Chicago, Ill. the following property, to wit:"

"It is hereby certified that this property belongs to the undersigned, is in good mercantile condition and free from lien or encumbrance. Said Storage Warrants to be issued to order of Alex Rodgers, in accordance with proposal for Warehousing Contract dated Aug. 25, 1900, of which this Application and the Valuation Memorandum bearing same Warrant Numbers and of even date herewith is hereby made a part", accompanying the same with a valuation memorandum as follows:

"Valuation Memorandum.

"Chicago.

"National Storage Company.

"Room 217, First Nat'l Bank Bldg., Chicago.

"To Alex Rodgers,
    "#220 #230 Johnson St., Chicago.

| | | | MARKET VALUES | | |
|---|---|---|---|---|---|
| Numbers Lot. | DESCRIPTION OF PROPERTY. | DATE | Value of each item. | Values covered by each warrant. | Warrant Number. |
| | | | | | |

"The property specified on the above memorandum which for purposes of warehousing has this day been placed in the possession of the National Storage Company, by the subscriber, is the same as that entered on Application for Storage warrant of corresponding warrant number, and even date herewith, and the undersigned hereby guarantees that the responsibility of

the Storage Company, in event of loss of any property covered by warrants enumerated, shall not exceed the values given above, unless, before such loss occurs, notice of change in value shall have been given to and acknowledged by said Storage Company."

Thereupon, an employé of the company would inspect the property specified in the application and valuation memorandum, and place upon the pile a pasteboard tag of the form following:

"No disturbance permitted while this card is posted.

"Warehouse card, National Storage Company, dated .................... Warrant No. ...... Lot No. ...... Section No. ...... Pile No. ......"

The Storage Company would then issue to the bankrupt a warehouse warrant or receipt in the form following:

"Warrant No. ...... Lot No. ...... National Storage Company, Office 217 First National Bank Building, Chicago, hereby acknowledges to have received .......... to weigh .......... pounds, contained in Div. ...... Sec. ...... floor at its warehouse premises No. 281, located at 220 to 230 Johnson Street, Chicago, Illinois, and will surrender the same to the order hereon of Alexander Rodgers upon payment of charges and delivery of this warrant, at its office, Chicago, duly endorsed.

"It is agreed that this company is not responsible for loss or damage to property occasioned by fire, water, leakage, vermin, ratage, shrinkage, accidental or providential causes, riot or insurrection, frost or change of weather, or from being perishable while in storage, and that this company shall, in the custody of the above property, be the agent of the holder of this warrant.

"Record Book ...... page ...... Storage and charges as per contract on file with this company.

"Chicago ...................."

These warrants the bankrupt would place at banks and with others as collateral to loans made to him. When it was desired to remove seed for which warehouse receipts had been obtained, application was made on a formal printed blank, the warehouse receipt returned and canceled, and a release issued by the storage company to the bankrupt.

The storage company had no warehouse of its own, only such as was leased, as was the one in question here. It had no keys to this building. The bankrupt alone had the keys, and access thereto was obtainable only through him. The signs placed upon the walls of the building were obscured, and not readily observable by reason of the fact that the piles of seed were higher than the signs. After the lease he continued as before to carry on his ordinary business upon the premises, maintaining an office with sundry clerks and workmen upon the premises. He bought and shipped seed, cleaned the same, and occasionally cleaned seed on which receipts were issued, taking it out of the bags, cleaning it, and restoring and adding a sufficient amount of other seed to equalize the loss in the cleaning. Also, in some instances, the bankrupt shipped out the property before the receipts were canceled; but the storage company did not know of it. The bankrupt also, from time to time, as the exigencies of his business prompted, brought seed to the warehouse, and substituted it for seed on which receipts had been issued, removing the seed on which receipts had been issued, and replacing the tags on the bags substituted. This was done in many instances, and sometimes several times with the property covered by one receipt. Whether the storage company knew of this custom of business is left somewhat doubtful by the evidence. The storage company, however, had notice of the custom of the bankrupt to clean the seed so placed in storage. The inspector of the storage company called at the premises from one to five times a week. Once or twice a week he would check over the goods stored, and see that the tags were on the bags and that the stock was all right. The bankrupt hypothecated some of these receipts with the First National Bank of Chicago to secure loans to the amount of $12,000, and some of them with H. W. Rogers & Bro. to secure a loan of $5,000, and he sold some of the receipts to other parties, receiving the full value of the seed.

Upon the adjudication of bankruptcy, the receiver, at the request of the general creditors of the bankrupt, applied for an order for the immediate sale of the seed in the warehouse; whereupon the First National Bank of Chicago appeared and pleaded that the bankruptcy court was without jurisdiction to decree a sale of a certain part of the property, alleging, in support of its plea, that it held warehouse receipts issued by the storage company upon certain specified parts of the property, which were duly indorsed by the bankrupt, and delivered and pledged to the bank for moneys in good faith loaned and advanced to the bankrupt; and claiming that the property was in the full possession and control of the National Storage Company, and was not in the rightful possession of the receiver. A similar plea was filed by H. W. Rogers & Bro., who held warehouse receipts on certain other part of the property to secure a loan of $5,000. The National Storage Company also appeared, denying the jurisdiction of the court to order any sale of the property, setting forth the property which at the time of the bankruptcy was stored in the premises upon which it had issued warehouse receipts, and claiming that it was in the actual possession of the property, and that its receipts entitled the holders thereof, upon presentation to it, to possession of the property.

The matter was referred to a referee, who reported August 5, 1901, that the bankrupt, by reason of the facts stated, was not, at the date of filing the petition or at the date of adjudication, in possession of the property mentioned in the answers, and that the receiver had not possession or right of possession of the property; that the receipts of the National Storage Company were valid under the law of the state of Illinois, and were transferable by indorsement; and that the indorsement of the receipts held by the several parties answering constituted valid transfers to them of the property represented by such receipts; and recommending that the petition be dismissed as respects all property covered by the warehouse receipts. On the same day the court entered an interlocutory decree which held that the receiver receive and take possession from the bankrupt, peaceably, the property in question, namely, the several lots of seed, set forth in the answers of the First National Bank, H. W. Rogers & Bro., and the National Storage Company, in the warehouse; and that the court had jurisdiction and possession of that property in this cause; that the court sustained the objections and exceptions to the report as to the jurisdiction and possession of the court; and, it being deemed most advantageous to sell the seed in question at that time, and the bank stipulating that it would sell and hold the funds derived from the sale of the seed subject to the further order of the court, it was ordered that the First National Bank sell the seed at once, and report its acts and doings in the premises to the court. The sale was had, and on September 23, 1901, the court confirmed the sale, and the bank and Rogers & Bro. filed their petitions, claiming preference and liens on the proceeds of the sale reported by the bank, and the court ordered the trustee of the bankrupt and any parties in interest to answer such petition. The trustee and James A. Patten, creditor, thereupon answered such petitions, upon which proof was taken, and on October 29, 1902, the court entered a final decree confirming the report of the referee, except so far as the same found that the bankruptcy court was without jurisdiction, decreed that the receiver had not the right of possession to the property mentioned, but that the National Storage Company had, and was entitled to the same; and, reciting the sale of the property by the First National Bank under the interlocutory order or decree, the proceeds of which were in possession of the First National Bank, distributed the proceeds to that bank and to H. W. Rogers & Bro., according to their respective claims. From which decree the trustee and James A. Patten, a creditor to the amount of $34,000, appeal to this court.

Newton Wyeth and Joseph E. Paden, for appellant.

Orville Peckham, Samuel Kerr, and Wallace Hickman, for appellee.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

JENKINS, Circuit Judge (after stating facts as above). The court below properly ruled that it had jurisdiction of the subject-matter.

Its officers acquired possession of the property in dispute from the bankrupt. It is, indeed, claimed by the storage company that the writings and the facts embodied in the statement of the case show that it, and not the bankrupt, had possession prior to the bankruptcy; but the receiver had in fact acquired peaceable possession of the property, and subsequent proceedings in the bankruptcy court upon petition of the present objectors to the jurisdiction, by which the property was sold by the bank under stipulation that it should hold the fund subject to the order of the court, placed the property and its proceeds in custodia legis, and the court had the right to determine the ownership of the fund in its possession. Haven & Geddes Company v. Pierek, Trustee (C. C. A.) 120 Fed. 244; In re Antigo Screen Door Company, herewith decided, 123 Fed. 249. The policy of the law of the state of Illinois denounces all secret liens upon property. They are held to be constructively fraudulent as to creditors, and the property, so far as their rights are concerned, is considered as belonging to the one having the ostensible possession. Ketchum v. Watson, 24 Ill. 591; McCormick v. Hadden, 37 Ill. 370; Murch v. Wright, 46 Ill. 487, 95 Am. Dec. 455; Chickering v. Bastress, 130 Ill. 206, 22 N. E. 542, 17 Am. St. Rep. 309; Peoria Manufacturing Company v. Lyons, 153 Ill. 435, 38 N. E. 661. And so property held upon conditional sale is subject to attack, and may be held against the vendor by creditors of the possessor; and this upon the ground that to suffer, without notice to the world, the real ownership to be in one person and the ostensible ownership in another, gives a false credit to the latter, and in this way works an injury to third persons. It is said in The Union Trust Company v. Trumbull, 137 Ill. 146, 180, 27 N. E. 33:

"There is no mode under our law, except by chattel mortgage duly acknowledged and recorded, by which the owners of personal property, retaining its possession, can give another a lien upon it that can be enforced as against creditors and subsequent purchasers."

Although the rule is otherwise in other states with respect to conditional sales (Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51, 30 L. Ed. 285), we are in duty bound to defer to the law of the state in respect of property within that state. Hervey v. Rhode Island Locomotive Works, 93 U. S. 664, 672, 23 L. Ed. 1003; Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329, 45 L. Ed. 457. The transaction is not changed by the form of the agreement under which it is cloaked. We are to look to the real purpose of the contract, and not to the form or the name given it by the parties. Murch v. Wright, supra; Hervey v. Rhode Island Locomotive Works, supra.

We are thus brought to the consideration of the real character and purpose of the transaction between the bankrupt and the storage company. We are to ascertain the real intention of the contracting parties from the whole agreement read in the light of the surrounding circumstances. The bankrupt was largely engaged in purchasing seed upon credit, storing the property purchased in his warehouse. He occupied the premises as a place of business, maintaining an office there, with clerks to assist in the management of the business, and with porters to handle the seed. The premises were subject to a

125 F.—12

rental of $250 a month. He arranged with the storage company, which had no warehouse of its own, that it would issue warehouse warrants or receipts to the bankrupt for property upon the bankrupt's premises for a certain small charge per month upon the value of the property covered by the receipts. He executed a lease of the premises to the storage company, to continue so long as the bankrupt should desire, and so long as property remained thereon for which warrants or receipts had been issued; and this without any payment of rent by the storage company, the rental in fact being paid by the bankrupt. The storage company neither required, nor was it given, any key to the premises. The bankrupt remained in possession of the premises as before the agreement, continuing to transact his business there as he had formerly done. There were certain signs placed upon the different floors of the building, indicating that the storage company controlled the premises. These were small and obscure signs, not likely to attract attention, and most of them hidden behind the piles of bags of seed. No sign was displayed upon the exterior of the building indicating any proprietorship of the storage company, or giving notice to the world that any other than the bankrupt had possession and control. There was no open, notorious manifestation of a change of possession, none was intended, and there was none in fact. Upon each pile of bags of seed for which the warehouse receipts or warrants were issued there was placed a small tag, which might be discovered upon careful search. The bankrupt substantially treated this property as his own, at times going through the forms prescribed by the storage company, and, whenever he found it necessary, ignoring them. We do not find that the storage company had knowledge of this action of the bankrupt, but it certainly knew that it was possible under the circumstances for the bankrupt to do with the property as he would, since it was left within his control.

It is difficult for us to look upon this transaction as a warehousing of property. The storage company assumed no liability to the bankrupt, and assumed only such responsibility as the law imposes upon it with respect to those advancing money upon the faith of its warehouse warrants or receipts. The name of the company is in itself, under the circumstances, a false pretense. It did not store property. It had no premises upon which to store property. The bankrupt stored the property. The bankrupt paid the rental of the premises. It is true that an agent of the storage company occasionally visited the premises and inspected the property in a sort of a way, but exercised no supervision or control that would prevent the bankrupt from doing with it as his will might dictate or his financial necessities might require. We cannot but regard this arrangement as a subterfuge, a mere device to enable the bankrupt to hypothecate the warehouse warrants or receipts, and so to raise money upon secret liens upon property in his possession and under his control. The written agreement indicates this. It is somewhat startling to learn that a warehouse company should store goods of this character for another upon the premises of that other, taking compensation as for storage, not related to the cost of storage, or to the expense of receiving and delivering the property, not according to the space occupied by the property,

but according to the value of the property. The fact here is patent that the storage company assumed to the bankrupt no liability, and that the sole purpose was to issue warehouse warrants or receipts, making such inspection only as, in its judgment, would protect it from liability to third persons by reason of the issue of its warrants. To uphold such a scheme would permit every merchant in the state, notwithstanding the declared policy of the state to the contrary, to have possession of large stocks, thereby inducing credit, and to cover them with secret liens, thereby deceiving creditors. It would, in effect, permit such merchant to pledge his entire stock without change of possession, without record of it, and without notice to the world. Such a scheme is disapproved by the law of the state of Illinois, which in this instance we are bound to uphold, however specious may be the device or however attractive may be the form by which it is cloaked. Such a scheme within the state of Illinois is constructively fraudulent as to creditors, and voidable by creditors.

Nor can we uphold this transaction as a pledge of the property to the bank and to H. W. Rogers & Bro. Actual or symbolical possession of personal property in the pledgee is essential to its pledge. It is true that when the actual delivery is to a carrier or warehouseman, and bill of lading or warehouse receipt is given therefor, the transfer of the instrument and its delivery to the pledgee is regarded in the law as delivery of possession to the pledgee of the property represented by the instrument; but it is a necessary condition to the existence of such symbolical possession by the pledgee that the property itself be in the possession of some person other than the pledgor. Two different persons cannot be in the actual adverse possession of the same property or premises at the same time, and, as we find the actual possession and actual control of the property in dispute to have been in the bankrupt, the transfer of these warehouse receipts to bona fide holders for value, even without notice of the fact, cannot constitute a valid pledge of the goods, as the storage company had not possession and control of the goods. Union Trust Company v. Trumbull, supra.

It is true that it is ruled by the Supreme Court of Illinois, in the case last cited, that such transactions, being not in fact, but only constructively, fraudulent, are upheld against general creditors, and are only voidable by judgment or attaching creditors—as in the case of an unrecorded chattel mortgage. In such case the lien of the unrecorded mortgage, and the title in the case of a conditional sale, and so also these storage warrants or receipts in the hands of a bona fide holder for value, would be sustained, except as against execution or attaching creditors. It is also ruled that an assignee, under the insolvent law of the state, takes as a volunteer, and subject to all liens and equities enforceable against his assignor. Union Trust Company v. Trumbull, 137 Ill. 146, 27 N. E. 24; Hoover, Owens & Rentschler Co. v. Burdette, 153 Ill. 672, 39 N. E. 1107; Schwartze v. Messinger, 167 Ill. 474, 47 N. E. 719. The rule in some other states of the Union with respect to the rights of an assignee under the state insolvent law is different, doubtless arising from the difference in the

various insolvent laws. Some of these laws do not prevent suits by creditors; others do. Under some statutes the assignee represents only the assignor, and can assert only the right of the assignor. Under others the assignee represents also the rights of creditors, and can enforce their rights without respect of the right of the assignor.

We are therefore brought to the question whether, under the bankruptcy law, the trustee takes solely in the right of the bankrupt, or whether he also represents the rights which creditors have, and the authority to enforce them; whether the petition in bankruptcy is merely the appropriation by the bankrupt of his property to his creditors, or an assertion in behalf of creditors of rights which they had independently of the bankrupt, and which he himself could not assert. Notwithstanding some loose expressions in the decisions upon this subject, we are satisfied, from a careful scrutiny of the act, that the filing of the petition is something more than the dedication by the bankrupt of his property to the payment of his debts; that the trustee is not only invested with the title of the property, but since, after the filing of the petition, the creditors are powerless to pursue and enforce their rights, the trustee is vested with their rights of action with respect to all property of the bankrupt transferred by him or incumbered by him in fraud of his creditors, and may assail, in behalf of the creditors, all such transfers and incumbrances to the same extent that creditors could have done had no petition been filed. The filing of the petition, followed by seizure and by adjudication in bankruptcy, is a seizure of the property by the law for the benefit of creditors, and an appropriation of it to the payment of the debts of the bankrupt. It is a seizure of the property by legal process, equal in rank to and of the same force and effect as by execution or attachment. This has been held by various courts of appeals, in which decisions we fully concur. In re Pekin Plow Company, 50 C. C. A. 257, 112 Fed. 308; In re Garcewich, 53 C. C. A. 510, 115 Fed. 87. It is said by the Supreme Court in Mueller v. Nugent, 184 U. S. 1, 14, 122 Sup. Ct. 275, 46 L. Ed. 405: "It is as true of the present law as it was of that of 1867 that the filing of the petition is a caveat to all the world, and in fact an attachment and injunction." We have assumed that the bank and H. W. Rogers & Bro. are bona fide holders for value, and without notice, of these warehouse receipts, giving therefor a full consideration. As against the bankrupt they would be entitled to protection, and would be held to have the title to the property; but, the issue of these warrants being constructively fraudulent as to creditors of the bankrupt, their right must be held subject to the claims of the creditors. These warrants are not commercial paper, and are not protected by the law governing that class of instruments.

The decree is reversed, and the cause remanded, with directions to decree for the trustee.