## In re THOMAS ELECTRIC CORPORATION.

### BINNS v. THOMPSON et al. (two cases).

(Circuit Court of Appeals, Seventh Circuit. April 11, 1922.)

Nos. 2951, 2952.

1. **Bankruptcy ⬤140(1)—Sales ⬤474(1)—Title of conditional seller, recovering possession before levy, good against buyer's creditors.**

In Illinois, a seller who, though parting with possession of the property, reserves in himself the title, may assert it against creditors of the buyer, except such as, while the property is in the buyer's possession, have levied attachment or execution thereon; so that, the seller having regained possession before any such levy, his title will prevail as against the execution or attachment, or bankruptcy proceedings against the buyer having the effect of such a levy.

2. **Sales ⬤475—Only such interest as buyer had under conditional sale contract passed by his sale of interest under the contract.**

Only such interest as conditional buyer had passed to a corporation, by its acceptance of his proposition to sell to it, in consideration of its stock, his "rights, title, and interest in" the property "under the terms and provisions of" the conditional sale contract.

3. **Corporations ⬤426(10)—Cannot take benefits, without assuming burdens, of contract of president.**

A corporation cannot take the benefits, without assuming the burdens, of a contract made by its president in his own name to secure for it possession of property, his rights in which, under conditional sales contract from another, he had sold to it.

4. **Bankruptcy ⬤178(1)—Recognition of conditional seller's title held not fraudulent.**

Where a conditional buyer transferred his interest in the property conditionally bought to a corporation, of which he was president and held substantially all the issued stock, his agreement with the conditional seller that the latter should continue to retain title was not fraudulent, as respects the title to the property, on the subsequent bankruptcy of the corporation, even if it was not the corporation's agreement, in that to his signature was not appended the word "President," since, if the corporation was to have the benefit of the use and possession of the property, it could have it only on the terms on which the conditional seller consented to part with the possession.

5. **Sales ⬤474(1)—One making conditional sale held not estopped to assert title against buyer's creditors.**

One making a conditional sale, reserving title till the price is paid, having regained possession for nonpayment before any levy by others, is not estopped to assert title against creditors of one to whom the buyer had sold his interest in the property under the contract of conditional sale, having done nothing to lead others to believe he had parted with his title, but asserted his right thereto whenever questioned.

Appeals from the District Court of the United States for the Eastern Division of Northern District of Illinois.

---

In the matter of the Thomas Electric Corporation, bankrupt. From an order of bankruptcy adjudication, and from an order dismissing the intervening petition of Edward H. Binns, which was offered by Edward M. Thompson and others, intervener appeals.

Second order reversed, with direction; appeal from first order dismissed.

Both appeals are by Binns, one from an order of bankruptcy adjudication, and the other from an order dismissing Binns' intervening petition. A single record presents both appeals.

On the filing of the bankruptcy petition the marshal seized as property of the bankrupt a quantity of tools and machinery, of which Binns claimed to be the owner in possession, and his intervening petition asks their return. The special master, to whom both petitions were referred, and who heard most of the voluminous evidence, reported, recommending the dismissal of the petition in bankruptcy and the allowance of the intervening petition. The court re-referred the petitions to the special master for the taking of further testimony, which was taken, and reported to the court, whereupon the orders appealed from were made.

Binns, a resident of Pittsburgh, Pa., owned an electric clock factory at Rockton, Ill., which was not in operation. Desiring to dispose of it, one Thomas, of Chicago, became interested, and after some negotiations they entered into a written contract, of date May 4, 1918, reciting that Thomas contemplates forming an Illinois corporation with authorized capital of approximately $100,000, for carrying on such clock business, Binns agreeing to convey to Thomas, or his corporation to be organized, the clock plant at Rockton, including patents and good will; that Thomas would assume to make necessary repairs on outstanding clocks as per guaranty, and the obligations of a contract with Keystone Watch Case Company, and to pay Binns on transfer of the plant $7,000 in cash, and give his notes for $5,000 in three months and $5,000 in six months from date of delivery of property, and $500 in capital stock of such corporation at time of the delivery, the notes to be secured by chattel mortgage on the plant, and delivery of the property to be made at earliest date, not later than May 21, 1918. The agreement was conditioned on ability of Thomas to secure an agreement with one Thompson, under whose patent the clocks were made, and the consent of capital issues committee of Federal Reserve Bank to issue capital stock, and of the secretary of state of Illinois to issue stock of the corporation.

Thomas requested, and Binns granted, extensions of time for carrying out the contract. July 6, certificates of incorporation issued showed capital stock of $150,000 of $100 shares, the subscribers being Thomas 1,470 shares, Grace Thomas (his wife) 5, W. H. Gray 5, and H. W. Crane 20. It showed that $80,000 of the stock was paid up, $76,000 being in the clock company property, and $4,000 in cash, and the $70,000 being unpaid. The corporate minute book shows that, under date of June 27, the directors, consisting of Thomas and wife and Gray, accepted a written proposition of same date by Thomas wherein he proposed to sell his "rights, title, and interest in" the clock company property "under the terms and provisions of a certain contract between me and Edward H. Binns," and also a real estate lease and option, for $76,000 "of the stock of the Thomas Electric Corporation at par." Thomas had leased a building in course of construction at Chicago in which to install the plant, and on June 28, he wired Binns to come to Chicago July 10 to close the transaction, saying it would be necessary to ship the engine first for installation in the new building while it was under construction. July 1 Binns' agent wired Thomas protesting against removal of the engine unless at least 50 per cent. of the cash payment was made. July 11 Thomas wrote Binns informing him of the necessities of the case, and that the engine had been removed. On the 11th Binns wired that this is in violation of instructions, and on the 15th Thomas went to Pittsburgh and after conference with Binns executed the paper reciting that some of the machinery had been moved without Binns' consent, and agreeing to hold Binns harmless by reason thereof, and on July 17 Thomas wrote Binns that no more of the property would be shipped until ad-

justment was made, and that that which had been shipped he had insured in Binns' name. Communications along the same general line continue, Thomas promising to send $2,000 at once and succeeding on the 22d in raising $1,000, and' sending it to Binns, saying in a letter, "It is to apply on the purchase account and as a forfeiture," and in acknowledging receipt Binns said that by acceptance he does not waive ownership of the property and that Thomas "will not further disturb the same until complete settlement has been made," referring also to the necessity of Thomas making arrangements with the Keystone Watch Case Company without delay.

About August 22 Binns went to Rockton and learned for the first time that most of the property had been removed from the plant, notwithstanding Binns had during all this time kept watchmen there. Thereupon he came to Chicago and employed attorneys, and after much negotiation with Thomas and others a new agreement was made, under date of August 24, between Binns and Thomas, their respective attorneys being present, which, after reciting the cancellation of the agreement of May 4, and that the vendee Thomas is desirous of purchasing vendor's clock business, and that vendee has removed the property from Rockton to the Chicago building, excepting certain parts which still remained at the Rockton factory, conveys to Thomas all of the clock property at both places together with good will and patents. Thomas agrees to pay Binns on or before September 30, 1918, $6,000, and with such payment to execute to Binns two notes of $5,000 each, payable three and six months from September 30, secured by chattel mortgage on the plant, and not to use the property or assign to the Thomas Electric Corporation or to any one else until the $6,000 is paid and the chattel mortgage given, also to transfer to Binns when the last note is paid 7 shares of Thomas Electric Corporation stock.

Thomas agreed also to assume certain rent payments of the Rockton building, and to insure the property for the benefit of Binns; also to reimburse Binns by September 30 for his watchmen and custodian expenses at Rockton from the date of the previous contract, and also to pay by same date interest on the unpaid purchase price from date of first contract to September 30, and to reimburse Binns for one-half the expense of his trip from Pittsburgh; also that the title of all the property remain in Binns until the making of $6,000 payment and giving and recording of chattel mortgage, and doing the other things, as specified, and that Thomas may remove to the Chicago building the rest of the property at Rockton; also to assume Binns' obligation to the Keystone Watch Case Company amounting to $1,634.03. The $1,000 previously paid was stated to be an additional consideration to Binns for the contract, and it was agreed that time shall be of the essence of the contract, and that any payments made shall be forfeited in case of default in performance. At the same time Thomas executed an affidavit wherein the two contracts are referred to by date, and it is deposed that Thomas had not placed or caused to be placed on any of the property any incumbrance, and that to his knowledge there was no incumbrance thereon. At the same time Thomas, as lessee of the Chicago building, executed an assignment of the lease to Binns who was to "hold the same and have all rights thereunder as security for the performance of" the contracts. Except as indicated, no money was paid Binns, and none of Thomas' covenants in either agreement was complied with, except to pay some rent at Rockton, and reach an understanding with respect to the patents.

October 18 Binns notified Thomas that the last-named agreement was terminated because of Thomas' failure to perform; and on October 24 Binns' attorneys, by custodian, took possession for Binns of the Chicago premises and the property therein, which possession continued until the property was seized by the marshal under the bankruptcy proceedings which were instituted by the filing of the petition December 4, 1918.

From the time of the execution of the first contract Thomas made diligent effort to raise funds, primarily to make the payments on the contract and also to equip the new factory and get the business going. He succeeded in securing loans from a few parties, from the father of Crane about $6,000. Petitioner Carter let him have $700, but the Crane loan is by far the largest

claim. Out of the money that was so raised the $1,000 payment to Binns and the rent payments were made, also such of the moving and installation expenses as were paid. Many of the latter remained unpaid. Carter, and Crane for most of his advances, took notes from Thomas, who signed the corporate name by himself as president, personally indorsing the paper, and in some instances his wife joining in the indorsement. So far as the evidence shows, such signature by Thomas of the corporate name is the only instance of any business transaction purporting to be by the corporation itself. The moneys raised were all received by Thomas and by him paid out. No corporate books of account were opened, or kept, nor any bank account, and every item of business was transacted by Thomas himself. The petitioning creditors and Mr. Crane testified that at the time of advancing their money they did not know that Binns had or asserted ownership in the property. On the entrance door of the Chicago factory appeared the corporate name.

August 10, 1918, the secretary of state issued permission to sell stocks and bonds of the corporation under the "blue sky" law of Illinois, but it does not appear that any was sold, nor that, apart from the Thomas transaction, any of the subscribed stock was ever paid for, nor that Thomas had sold or conveyed any stock, except that with the Carter note he put up as collateral security 100 shares of the stock, and a life insurance policy. In the opinion some further facts will be referred to.

John C. Slade, of Chicago, Ill., for appellant.

O. M. Carter, for appellee.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). It is the law of Illinois that where a vendor, parting with possession of personal property, reserves in himself the title, he may assert his title as against creditors of the vendee, except such as, while the property is in the vendee's possession, have levied an attachment or execution thereon. And if, prior to any such levy, the vendor acquires possession of the chattels, his title will prevail as against any attachment or execution. Union Trust Co. v. Trumbull, 137 Ill. 146, 27 N. E. 24; Staver Carriage Co. v. Richardson, 203 Ill. App. 620, and cases there cited; In re Rodgers, 125 Fed. 169, 60 C. C. A. 567.

For five or six weeks next preceding bankruptcy proceedings (which alone here could give the creditors the standing of a levied attachment or execution), Binns was in the actual exclusive possession of the property, and he must prevail in his claim therefor unless the record discloses reasons wherefor he should fail. From the petition and the record and briefs and arguments, we understand appellees' contention to be (1) that the property had passed to the corporation, and that the agreement of August 24 was fraudulent and void because entered into by Thomas alone, and that Binns therefore had no right under the agreement to possess himself of the property; (2) that Binns knew and intended that the property should pass to the corporation, and be by it used as the basis for credit, and that therefore he may not as against the creditors assert his ownership of the property.

[2] If we accept the contention that by means of Thomas' proposition and acceptance as written in the corporate minute book, Thomas' interest in the property passed to the corporation, what was then in fact conveyed? Clearly only such interest as Thomas had under the May 4 contract, and this was but a right to acquire Binns' title upon compliance with the contract terms. Thomas, the president, and the

practical owner of the corporation, and its directing spirit, did not convey to it a better title than he himself had. But whatever of equity in the property the corporation acquired, it would be Thomas' duty to protect as best he could. By the contract Binns was empowered after May 21 to end the Thomas interest, if by that time the terms he agreed to were not fulfilled. If, therefore, there was an equity to be protected, naturally Thomas entered into negotiations with Binns to such end. It is evident Thomas had no funds of his own, and he was making desperate efforts, not only to raise money to pay off Binns, but also to induce Binns to grant further time for doing so.

The undertaking to bring the property to Chicago was in the interest of the corporate enterprise, and Thomas' efforts to that end would be clearly within his scope of duty in his management of the corporation. We find no record or hint of any repudiation by the corporation of any of his long series of transactions in that regard. If there can be said to have been a corporate plan and purpose, it was to establish this clock business in the Chicago plant. Thomas' action in bringing the property to Chicago, notwithstanding this was in violation of the agreement with Binns, was in furtherance of the corporate purpose, if there can be said to have been any such; and Binns' ultimate consent that the property be brought to Chicago was a corporate benefit of which the corporation, if concerned at all, promptly and fully availed itself. It is the claim that the property when brought to Chicago became the property of the corporation, and was by it being used for its own benefit. But without Thomas' negotiations with Binns, the property would have remained at Rockton.

[3] The corporation cannot take the benefits of Thomas' negotiations to secure for it possession of the property without at the same time assuming the burden of whatever Thomas agreed to as the condition for such consent by Binns. It is very apparent from the record that Binns never did consent nor would have consented that the property be brought to Chicago, unless he retained title, and was protected in it until the stipulated conditions had been performed.

[4] The fraud alleged in the bankruptcy petition consists primarily in Thomas executing in his own name the agreement of August 24. But there is nothing in this agreement which differs radically from that of May 4, the main feature being a definite extension for time of performance. But let it be assumed that because that agreement purports to have been made by him, and to his signature is not appended the word "president," it is not an agreement of the corporation. Nevertheless it embodies the terms and conditions upon which Binns consented to the change in possession, the dominant feature of which, as in the May 4 contract, is that the title remain in Binns until the purchase price is paid or secured. Indeed, one cannot read the record without concluding that at no time during all these transactions did Binns consent to part with his title on any other terms. It follows that, if the corporation would have the benefit of the possession and use of this property, it can have it only upon the terms upon which Binns consented to part with the possession.

Under the circumstances here shown fine distinction cannot be drawn between acts of Thomas and those of the corporation, for in the broad

sense Thomas was practically the corporation. He held substantially all the stock that was issued, and this was paid for by going through the form of having the minutes show his transfer to the corporation of his equity in the Binns property. Every act of any consequence was transacted by Thomas. He bought and sold, hired and discharged, and the corporate records show no corporate acts concerning such things. The corporation never had any books, accounts, funds, or any banking connections. To all intents and purposes it was a paper organization merely. In this view the omission from the contract of August 24 of the corporate name, or from Thomas' signature of his official title, is not significant, and cannot impair Binns' title to the property as in the contract reserved unto him.

[5] We are not impressed with the contention that Binns' conduct in relation to this property gives to the creditors any larger rights as against his title than Thomas or the corporation possessed. To be sure he was desirous of selling the property, and he may even have supposed that Thomas would raise some funds to pay him for it, by selling stock in the corporation. This was not inconsistent with Binns' retention of title to the property. The fact that he had at least a claim for the purchase price was well recognized by the principal creditors, and we do not think the record discloses any substantial evidence to warrant the conclusion that he did anything to lead others to believe he had parted with his title. On the contrary, it seems that he asserted his right whenever it was assailed or called in question. One witness, who was produced when the cause was re-referred, testified that Binns told him in substance Thomas was his partner or agent or promoter for disposing of the plant, and that under certain circumstances the plant was his, and under others it was to belong to Thomas or the corporation. This testimony is so at variance with most of the evidence that, apart from Binns' own contradiction, the conduct of all the parties refutes it. The general belief of the largest creditors a few days before Binns finally took possession of the property, is deducible from a letter to Binns, September 30, from the principal creditor, Crane, who said therein:

"Mr. Thomas agreed to sell out to me, but later he refused to do so, and as his payment of $6,000 to you is due to-day, and, if not met, will forfeit his contract, I am writing to you about this matter, since I have advanced all of the money which has been expended by Mr. Thomas, and, unless something is done I may lose this money. Furthermore, your property is being cared for at a certain expense, and will continue to be so cared for unless you order differently, and hence certain sums will have to be paid by you, which might not have to be paid if Mr. Thomas was responsible."

The Crane deal was not consummated. And under date of September 27 creditor Carter wrote Binns, saying, "In looking over the contract with Mr. Thomas, I find that payment of $6,000 must be made by September 30th," and suggests a purchaser for the property who would make a new contract with Binns; that unless he (Binns) had made other arrangements he is sure he could make a satisfactory contract with this man. These gentlemen, in their testimony, seek to avoid the force of the letters by saying that at that time they did not know of the fraud which they assumed existed in Thomas, and not the cor-

poration, entering into the contract of August 24. If, however, Binns in any way deceived or defrauded any creditor, action against him therefor would be in no way affected by the bankruptcy.

When Binns on October 3 repossessed himself of the property there had accrued no liens thereon, such as the Illinois authorities hold sufficient to divest him of his title, and his undisputed possession thereafter until the seizure by the marshal under the bankruptcy proceedings begun December 4 clearly entitled him to restitution of the property in accordance with his petition therefor. The order denying Binns' petition for restitution is reversed, with direction to the District Court to grant the petition.

The foregoing disposition of the petition for restitution of the property leaves Binns without any interest in the outcome of the bankruptcy proceeding, and his appeal from the order of the District Court adjudicating the Thomas Electric Corporation a bankrupt is therefore dismissed. The costs of the two appeals shall be borne, one-third by the appellant, and two-thirds by appellees.