# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### LOVE v. EXPORT STORAGE CO. et al.

#### (Circuit Court of Appeals, Sixth Circuit. February 1, 1906.)

#### No. 1,422.

1. APPEAL—PARTIES.

The rule established in the federal appellate courts requiring all parties against whom a judgment or decree is rendered, in the absence of severance, to join in suing out a writ of error or prosecuting an appeal therefrom, applies only to a joint judgment or decree against such parties, and has no application to separate judgments or decrees, though rendered at the same time and contained in the same entry.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Appeal and Error, §§ 1798–1803.]

2. SAME—STAKEHOLDERS.

Where certain trustees of a bankrupt as individuals became mere stakeholders of a fund in controversy after the institution of their suit in a state court, which was removed to the federal courts, and obtained and held the stake subject thereto, they were not necessary parties in their individual capacity to an appeal from a portion of a decree determining that appellee was entitled to the fund as against appellant, as to which such stakeholders had no individual concern.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Appeal and Error, §§ 1798–1805.]

3. WAREHOUSEMEN—WAREHOUSING GOODS—ELEMENTS.

The only thing essential to the warehousing of goods is that their possession be changed from that of their owner to that of the warehouseman, and hence it was immaterial that they were warehoused on premises belonging to the owner at the time of the warehousing, which was leased to the warehouseman for such purpose.

4. SAME—CHANGE OF POSSESSION—EVIDENCE.

Evidence *held* sufficient to establish a complete change of possession of lumber, alleged to have been warehoused by a corporation, from such corporation to the warehouseman.

5. CORPORATIONS—ACTS OF OFFICERS—AUTHORITY—DENIAL—ESTOPPEL.

Where a corporation received the proceeds of certain notes which were placed to its credit with plaintiff bank by means of certain transactions conducted by its president, by which he warehoused the corpora-

143 F.—1

tion's property and pledged the warehouse receipts to secure the discounts, and thereafter such proceeds were checked from the bank in its name by the president and treasurer, as he was authorized by the by-laws to do, the corporation was estopped to deny that the president had no authority to conduct such transactions.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 1704.]

6. WAREHOUSEMEN—TAXES—FAILURE TO PAY—EFFECT.

Where a warehouseman, which was a foreign corporation, issued warehouse receipts for certain lumber located in Tennessee on property leased to it by the owner of the lumber, the fact that such warehouseman had failed to pay a privilege tax to which warehousemen in Tennessee were subject, as provided by Acts 1901, c. 128, pp. 200, 221, 227, declaring that any person carrying on their business without paying such tax should be guilty of a misdemeanor, did not invalidate warehouse receipts issued for such lumber in the hands of a bona fide pledgee.

7. BANKRUPTCY—PLEDGES—FRAUD—GOOD FAITH OF PLEDGEE.

Where certain warehouse receipts were pledged to a bank by a corporation, while insolvent, to secure a certain note then executed and any liability thereafter contracted, and there was no evidence to impugn the good faith of the bank, it was entitled to maintain its right to the property so pledged not only for the payment of such note, but for other notes subsequently discounted as against the corporation's trustee in bankruptcy, though the pledge was made within four months prior to the filing of the petition in bankruptcy.

8. SAME—APPEAL—OBJECTIONS NOT MADE AT TRIAL.

Where certain notes indorsed by a bankrupt had matured and were treated as a part of the bankrupt's obligations in a trust agreement for the organization of a new corporation to take over the bankrupt's assets and continue its business, and at the trial the holder of such notes proved generally that they were a part of the liability of the bankrupt to it, and no objection was made to the form of such proof, the bankrupt's trustee was not entitled to urge for the first time on appeal that such notes were not valid claims against the bankrupt because of the absence of any proof of presentment for payment and protest.

[Ed. Note.—Appeal and review in bankruptcy cases see note to In re Eggert, 43 C. C. A. 9.]

9. PLEDGES—RELEASE—TRUST AGREEMENT.

Where a trust agreement for the organization of a new corporation to take over the assets of a bankrupt expressly provided that a bank, which was one of the bankrupt's creditors, should retain its right to the proceeds of certain lumber pledged to it over what was necessary to pay a certain note on account of the bankrupt's liability as indorser on certain other notes, and that to the amount it so received from the lumber it should not be entitled to the common stock in the new corporation, the bank's signature to such trust agreement did not constitute a waiver of the pledge.

10. BANKRUPTCY—TRUSTEE—STATE RECEIVERS—AGREEMENTS.

A bankrupt's trustee has no right to sue on an agreement made between state receivers of the bankrupt and one of its creditors.

11. APPEAL—FINDINGS OF MASTER.

A finding on a question of fact by a master will not be set aside on appeal, except on a clear showing that it is erroneous.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

J. C. McReynolds and E. E. Barthell, for appellant.
W. L. Granbery, for Export Storage Co.
Lawrence Maxwell, Jr., for Third National Bank.

Before SEVERENS and RICHARDS, Circuit Judges, and COCH-RAN, District Judge.

COCHRAN, District Judge.   On July 13, 1901, the American Hardwood Company, a Tennessee corporation, was engaged in the lumber business at West Nashville, in said state, and had been since March 8, 1900, date of its organization.   The lumber yard, in which was a small frame building used as its office and a buggy house, was held under a lease and comprised about four acres of ground, bounded on the north by a railroad, on the south by the Centennial Boulevard, on the west by Thirteenth street, and on the east by an alley.   It was surrounded by a fence composed of four wires and a string of plank, with gates in it, except on the side next to the railroad, which was open.   The office building was in the center of the south side next to the boulevard, and on top of it was a large sign bearing the company's name on both sides.   The company had in the yard over 1,000,000 feet of lumber distributed in 369 piles, worth about $30,000.   William H. Lewis was its inspector and yard foreman. He was subject to a Miss Albright, who occupied the office building and may be said to have had general charge of the premises.   No officer nor any other superior servant was stationed there.   Its head or principal office was in the Union Savings & Trust Company building at Cincinnati, Ohio, and was in charge of its secretary, Clarence G. Corkran, who resided temporarily in that city.   Charles E. Corkran was president and treasurer and resided in New York City.   The two Corkrans, and K. W. Hobart, B. W. Cross, and G. W. Daniels, constituted its board of directors.   The residence of the last three did not appear.   Charles W. Corkran was interested in and officially connected with 10 or more other corporations engaged in like business at other points in the United States.   He seems to have dominated all of said corporations, including said hardwood company.   Indeed he was really the owner substantially, if not entirely, of all their capital stock.   By the by-laws of the company it was provided, amongst other things, that it should be the duty of the president to sign and execute all contracts in the name of the company and affix the seal thereof thereto, when instructed so to do by the board; that the treasurer should have the care and custody of all funds that might come into his hands and deposit the same as treasurer in such bank or banks as the president might select; that the treasurer should have power to borrow money and execute and negotiate the promissory notes or bills of exchange received by the company in the course of its business, and should draw all checks against the bank account; and that either the president, vice president, secretary, or treasurer might, in the name of the corporation, issue checks, drafts, and notes and indorse or deposit for collection or discount, as the case might be, checks, drafts, or notes.

On the date aforesaid, to wit, July 13, 1901, the Export Storage Company, one of the appellees, an Ohio corporation, with its principal place of business in said Union Savings & Trust Company building at Cincinnati, was engaged in the business of warehousing, mostly,

if not entirely, in certain of the southern states. It had no warehouse of its own. Its business was confined to warehousing on the premises, whether actual warehouses or not, of those who desired to warehouse their goods. Prior to said date it had transacted a large amount of business, but had done but little, if any, in the state of Tennessee. It had a general agent for the state located at Nashville named Charles Sykes. A statute thereof provided for the payment of a certain annual tax by warehousemen for the privilege of carrying on their business therein, and declared it a misdemeanor for one to exercise such privilege without first paying the prescribed tax, punishable by a certain fine. Chapter 128, Acts 1901, pp. 200, 221, and 227. The appellee company had not paid this tax. The general agent, Sykes, had advised with the Comptroller of the state in regard to its payment, and had been told by him that there was no provision requiring a company like his to pay the tax. He stated that he stood ready to pay it if the company was liable, and an agreement was had that upon its being determined that it was, he was to be notified and to pay the tax. On said date, which was Saturday, the two Corkrans were in Cincinnati. Charles E. had been there for several days prior thereto and remained over until Monday, the 15th. One other director, G. W. Daniels, at the least, was also there on the 15th. It had been determined on behalf of said hardwood company, at the least by said Charles E. Corkran, its dominating personality and real substantial owner of its stock, to warehouse the lumber in its yard at West Nashville with the appellee storage company, to which it had given its consent, and two certain persons, T. J. Wilson and H. C. Yates, had been sent there to see to the taking of necessary steps to that end. Yates was inspector and yard foreman of the hardwood company at another yard, which it had in Tennessee, but Wilson does not appear to have had any further connection with it than in this particular matter. The former was to assist in inventorying the lumber and the latter to supervise what was done. Friday, the 12th, Yates and Lewis inspected and inventoried the lumber. They numbered the piles from 1 to 369, inclusive, ascertained the kind of lumber and number of feet in each pile and put a valuation thereon, and divided the piles into 13 distinct lots, designating them by the letters "A" to "M," inclusive. On Saturday, the 13th, at the office of Sykes in Nashville, a contract was entered into between Lewis and the appellee storage company for Lewis to act as custodian of the lumber, Sykes making the contract on the company's behalf, and a bond in the sum of $5,000 was executed for the faithful performance of his duties as such by him, with a Philadelphia surety company as surety. It is possible that the bond was not actually executed by that company until a later date, but it is dated the 13th. The contract provided that Lewis was to be paid $1 per month for his services as custodian. At the same time and place Lewis signed 13 statements, termed "inspection reports," one for each lot, giving the piles of lumber therein and the number of feet and kind and value of lumber in each pile, and executed 13 receipts for the lumber as custodian, one for each lot. Sykes prepared a lease from the hardwood company to the appellee

storage company of the lumber yard, dating it the 13th, and obtained the written consent of the former's landlord thereto, which was indorsed thereon. It was for one year and provided that the yard should be known as "Storage Premises No. 2," and should be used exclusively for storing personal property. The rental was recited to be $1 and other valuable considerations, receipt of which in advance was acknowledged. He also prepared 13 warehouse receipts, numbered from 2,035 to 2,047, to the hardwood company for the lumber and executed them on behalf of his principal. He then, the same day, mailed the lease, warehouse receipts, and Lewis' contract, bond, inspection reports and receipts to the appellee storage company at Cincinnati. That evening he and Lewis tacked on the inside of the plank forming the top of the fence, at each of the four corners of the yard, a yellow card, 10 inches long by 5 wide, having on it in print the words "Premises No. 2. Leased and Occupied by the Export Storage Company, of Cincinnati, Ohio. (Incorporated.)" Probably not more than one of the cards could be seen from the outside, and the printed matter thereon could hardly be read therefrom. Beginning on Sunday, and completing it in a day or so, Lewis, by Sykes' direction, fastened on each one of the piles a paper tag. The tags so used were advertising cards of the hardwood company and on the blank side thereof in pencil were the initial letters of the Export Storage Company's name, "E. S. C."; each tag having, also, the number of the pile to which it was fastened, the kind and quantity of lumber it contained, the lot to which it belonged, and the number of the warehouse receipt covering it. About a week afterward, by like direction, Lewis attached to each pile a wooden tag dressed on one side, upon which the name of the Export Storage Company was written in full, with the number of the warehouse receipt covering it and the number of the pile and the quantity of lumber it contained.

On Monday, the 15th, at Cincinnati, the papers from Sykes having been received, the lease from the hardwood company to the storage company was executed, Charles E. Corkran as president, acting on behalf of the former and affixing its seal thereto, and W. G. Coldeway, its general manager, acting on behalf of the latter. At the same time a contract between the two companies as to warehousing said lumber, dated the 13th, was executed in like manner, the warehouse receipts were further executed on behalf of the storage company by its said general manager and its secretary and treasurer, and registered with the Union Savings & Trust Company, and were then delivered to said Charles E. Corkran; he receipting therefor in the name of the hardwood company by him as president and treasurer. The warehousing contract provided that the hardwood company was to keep the premises in repair and that the storage company as full compensation for storing the property and issuing its receipts was to receive a premium of $\frac{1}{4}$ of 1 per cent. for each three months on the value of the property as inventoried; the salary paid by the storage company to the custodian not exceeding $1 per month and the expenses of ascertaining quantity and quality of the property and receiving and delivering same.

Thereafter, and upon the same day, said Corkran, on behalf of said hardwood company, obtained a loan of $21,000 from the appellee, the Third National Bank of Cincinnati, executing a note therefor, payable three months after date, to which the hardwood company's name was signed by him as president and treasurer, and pledged as collateral security therefor said 13 warehouse receipts, covering all the lumber in its yard at West Nashville, indorsed in said company's name by him as president and treasurer. In the pledge thereof, constituting a part of said note, it was provided that they were pledged as collateral security, not only for that note, but also for any other liability or liabilities of said company to the bank then existing or that might thereafter be contracted. The proceeds of the note, less the discount, were placed to the credit of the hardwood company, and on the same day and the next day thereto they were transferred, by checks drawn in its name by said Corkran as president, to another Cincinnati bank to pay drafts on said company by one Charles E. Roe, of Baltimore, Md., said Corkran's personal agent, held by it. It is claimed that in this way the proceeds of said note were diverted from the hardwood company to the personal use of said Corkran, and this would seem to have been the case. At the time of these transactions the hardwood company was insolvent, and it had been so since January preceding. It was, however, a going concern and in good credit. Subsequently thereto, to wit, between July 17th and 24th, that condition still existing, the hardwood company discounted to the appellee bank, before their maturity, 11 notes of certain of said lumber companies hereinbefore referred to, which were payable to it, amounting in all to the sum of $12,479.72, which notes were duly indorsed by said company to the bank. The proceeds thereof, less the several discounts, were placed to the company's credit in bank and were checked out the same as in the case of the proceeds of the $21,000 note.

Here it is necessary to go back a moment in our narrative. Nothing more was done in the way of placing the storage company, through its custodian, Lewis, in possession of the lumber than has already been stated. The sign of the hardwood company upon the office building was not removed. Lewis was not aware of the provision in the custodian contract that he was to be paid $1 per month for his services as custodian. He did not read carefully that contract or any of the other papers executed or prepared on July 13th. He simply glanced at them, and his knowledge of their contents was limited to what he observed in so glancing and what he was told in regard thereto. He knew that he was thereby created custodian of the lumber for the storage company and that thereafter it was to be regarded in his possession as such. Theretofore he had been paid by the hardwood company $9 per week or $1.50 per week day for his services as inspector and foreman. Thereafter he was at the lumber yard on Sundays, as well as week days, and was paid by the hardwood company $10.50 per week. The $1 per month provided in the custodian contract was never paid to him. Miss Albright prepared the inspection reports, met Wilson and Yates whilst at Nash-

ville, was informed by Lewis on July 13th that he had been appointed custodian in charge of the lumber and that the property had been leased to the storage company, and saw the tags placed on the inside corners of the fence and upon the piles of lumber. She remained in charge of the office as before and transacted whatever business of the hardwood company there was to be transacted there. It does not appear, however, that thereafter any business was transacted on behalf of that company other than to receive and answer whatever mail came to it there and receive the wages of herself and Lewis, a night watchman and possibly one or two other men under Lewis from the Cincinnati office and disburse and keep an account of them. Both she and Lewis seem to have understood that he was under her and subject to her directions the same as before. Neither seems to have fully understood the purpose and significance of what had taken place. There can be no doubt, however, that both understood that thereafter the lumber was in the possession of the storage company through Lewis as custodian and that Lewis was subject to no orders or directions in regard to the lumber except such as might emanate from the storage company.

Things so continued for about one month, to wit, until August 13th, when the inevitable crash came. On that date two alleged creditors of the hardwood company brought suit against it in the chancery court of Davidson county at Nashville, asking that a receiver be appointed to take possession of its assets and that it be wound up as insolvent. At once said Clarence G. Corkran, its secretary, and one of the plaintiffs, named Coleman Rogers, who in the meantime had become its treasurer, were appointed receivers. They continued to act as such until November 13th, when receivers were appointed by the United States District Court for the Middle District of Tennessee in bankruptcy proceedings against the hardwood company begun the day previous, November 12th. The state receivers, Corkran and Rogers, during their receivership, made no attempt to interfere with Lewis' custodianship or the control which the storage company had acquired of the lumber through the warehouse proceedings of July 13th. On the contrary, they recognized it and the lien which the bank obtained by reason thereof. They paid to the bank the invoice value of a large number of the piles and obtained from Lewis upon orders from the storage company the lumber contained in them, which lumber they subsequently sold for $874.10 less than what they so paid. This, however, was without any order from the state court and upon their own responsibility. They likewise so paid during their receivership Lewis' wages, the premium on his surety bond, the wages of a night watchman, an installment of rent under the hardwood company's lease, and the expenses for loading for shipment the lumber that had been released; the sums so paid amounting in all to $820.36. They paid nothing to Miss Albright, as she left August 20th. The sums they paid to secure the release of the lumber and on account of expenses were out of assets of the hardwood company which came into their hands from other sources, and they were credited by the appellee bank on the $21,000 note. Upon the appointment of the

federal receivers, the storage company began to pay Lewis his wages and continued to pay him until the termination of his custodianship as hereinafter stated. In one of his answers in his deposition Lewis states that he regarded his custodianship began at this time—i. e., with the payment to him of his wages by the storage company—but evidently there is a mistake here, as it is certain from all his answers considered together that he regarded that his custodianship began July 13th and continued until its termination. There can be no question as to this.

January 12, 1902, the hardwood company was adjudged a bankrupt, and on March 17th, at a meeting of its creditors, the appellant John W. Love, and Charles C. Tarbue and H. W. Williamson were elected as trustees. Previous to the adjudication an agreement, termed a "trust agreement," bearing date October 12, 1901, was entered into amongst said lumber companies, including the hardwood company, said Charles E. Corkran, who was stated therein to be the owner of all the stock in all of said lumber companies, except in so far as certain of said lumber companies, were stockholders of other of said companies, thus making him really the owner of all, certain creditors of said lumber companies, termed assenting creditors, it being contemplated that all might become parties thereto, and the North American Trust Company of New York. By said agreement said lumber companies assigned and transferred all their assets, said Corkran and lumber companies (stockholders in other said companies) all the stock thereof, and said assenting creditors their claims against said lumber companies, to said North American Trust Company, and said trust company was empowered to take such steps as were necessary to get possession of such assets and convert them into money, to pay the net assets realized after deducting a certain amount thereof as compensation for its services to a new corporation to be formed by a certain named committee of creditors, having a capital stock of the par value of $1,000,000, of which an amount equal to one-half of the net assets so paid to the corporation was to be preferred and the remainder common stock, in return for notes of said corporation equal to one-half of said net assets and the stock, preferred and common, of said corporation, and to distribute said notes and preferred stock and said common stock to the extent of the indebtedness in excess of said notes and preferred stock amongst the creditors ratably and deliver the balance of the common stock to said Corkran. The object of the agreement was to realize as much as possible out of the assets and to preserve the good will of said lumber companies for the benefit of their creditors and said Corkran. The appellee bank executed said agreement December 18, 1901, to the extent of the liability to it on account of said notes which were discounted by it subsequent to July 15th; i. e., between July 17th and 24th. It was recited therein that it held warehouse receipts for certain lumber of the hardwood company pledged to secure the $21,000 note and also its liability on account of said other notes, and it was provided therein that its right to said lumber was not released or to be in any way affected by said agreement, but that it should

be entitled to the proceeds of the sale thereof without affecting its right to the notes and stock of the new corporation as provided therein, except that it should surrender common stock of the new corporation at par to the amount, if any, realized by it from the sale of said lumber after the payment of said note of $21,000. At the same time it assigned and delivered said notes to the trust company and that company thereafter proved them as claims against the hardwood company in the bankruptcy proceedings.

April 20, 1902, this litigation began. Said John W. Love, Charles C. Trabue, and H. W. Williamson as trustees in bankruptcy filed a bill in the chancery court for Davidson county, Tennessee, against the appellees, Export Storage Company and Third National Bank of Cincinnati, Ohio. They asserted therein the right to the lumber remaining in the yard, which they alleged to be worth as much as $20,-000, and to the sums which had been paid by the state receivers, Corkran and Rogers, during their receivership, to the bank to secure the release of the lumber turned over to them as hereinbefore stated, and sought judgment therefor. May 3d said trustee and said appellees entered into a written agreement. By it the trustees as individuals were to take possession of the lumber remaining in the yard, convert it into money and hold the proceeds subject to the determination by the court as to who was entitled thereto. It was further provided therein that said individuals were to receive a commission of 5 per cent. of the net proceeds of the sale of the lumber to be paid by the appellee bank, if it should finally be determined that it was not entitled to said proceeds, and out of the bankrupt estate, if it should be so determined that the trustees were not entitled thereto. Pursuant to this agreement, said individuals at once took possession of said lumber, terminating the custodianship of Lewis which had continued from July 13, 1901, until then, and subsequently sold the lumber, realizing therefrom about $15,000. May 5th said suit was removed into the lower court by petition for removal filed in the state court by the appellees. July 16th an original bill was filed in the lower court by the appellee bank against said John W. Love, Charles C. Trabue, and H. W. Williamson, as trustees in bankruptcy of the hardwood company and as individuals, in which they asserted a lien on said lumber so delivered to said Love, Trabue, and Williamson as individuals and the proceeds thereof to secure payment of the balance due on the $21,000 note and the amounts due upon the 11 notes of the hardwood company discounted by it, upon said company's indorsement, and sought to enforce it. By supplemental bill filed July 26th, said trustees set up said agreement of May 3d, and made themselves parties plaintiff as individuals, and on the same date the two suits were consolidated. Subsequently an amended bill was filed by the appellant John W. Love as sole trustee in bankruptcy, his co-trustees having theretofore resigned their trusts, against the appellee bank, in which he sought recovery of the expenses incurred by said state receivers, Corkran and Rogers, during their receivership, in relation to said lumber, amounting to the sum of $820.36, the loss sustained by them in securing the release of certain portions of

said lumber and selling same, amounting to the sum of $874.10, and the invoice value of certain of the piles so released, which, it was alleged, subsequently came into the hands of the trustees in their individual capacity under said agreement and was sold by them, to wit, the sum of $992.20, if it should be held that he was not entitled to the full relief sought in the original bill.

The consolidated causes coming on for hearing, it was adjudged by the lower court, in substance, that the appellant was not entitled to any portion of the proceeds realized from the sale of said lumber; that the appellee bank was entitled to the whole thereof to be credited upon the $21,000 note to the extent of the balance due thereon, and the additional notes held by it indorsed by the hardwood company, for which said company was liable to it; that said Love, Trabue, and Williamson, should pay same to said appellee by surrendering to it certificates of deposit thereof with it which they held, and that appellant was entitled to none of the relief sought by him and his cotrustees. It is from the decree so adjudging that this appeal is taken.

The appellee has moved this court to dismiss the appeal, and the motion was argued and submitted at the hearing of the appeal. The ground of the motion is that John W. Love, Charles C. Trabue, and H. W. Williamson, as indivivuals, were indispensable parties to the appeal in the absence of a severance. They have not been made such, and there has been no severance. The position that said individuals were indispensable parties to the appeal is based upon the subposition that they were indispensable parties to the consolidated causes in the lower court. In support of the subposition are cited the cases of Wilson v. Oswego Township, 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70; Massachusetts & S. Cons. Co. v. Cane Creek Township, 155 U. S. 283, 15 Sup. Ct. 91, 39 L. Ed. 152; and the expression of Judge Clark in the opinion delivered by him on behalf of this court in the case of Tug River Coal & Salt Co. v. Brigel et al., 67 Fed. 625, 628, 14 C. C. A. 577, to wit:

"Where the object of a suit is to recover possession of property real and personal, parties in possession, although as stakeholders claiming no interest, are not formal, but indispensable, parties."

It is to be noted, however, that in the two township cases cited the stakeholders held therein to be indispensable parties in the courts of original jurisdiction were stakeholders at the beginning of the litigation and their citizenship was held to affect the jurisdiction of those courts, and it was such stakeholders that Judge Clark had in mind in the expression quoted. Here Love, Trabue, and Williamson were not stakeholders at the beginning of the litigation. They became such after the institution of the trustees' suit in the state court, and obtained and held the stake subject thereto. It is true that thereafter the bank's suit was brought and they were made defendants thereto as individuals, as well as trustees. The relief therein sought, however, might well have been made the subject of a cross-bill in the trustees' suit with which it was afterwards consolidated. The stakeholders here, therefore, occupy a different relation to the litigation from what they occupied in the authorities relied on. But it does not follow

that, because a person is an indispensable party in the court of original jurisdiction, he is an indispensable party in the appellate court to which the case may be carried. He may be an indispensable party in the one and not such in the other. For him to be an indispensable party in the latter court, it is essential that he be concerned or interested in the questions that are carried there for decision by the appellate procedure. The rule firmly established in the appellate courts of the United States requiring all parties against whom a judgment or decree is rendered, in the absence of severance, to join in suing out a writ of error or prosecuting an appeal therefrom, has application only to a joint judgment or decree against such parties. It has no application to separate judgments or decrees against such parties, though rendered at the same time and contained in the same entry.

Whether a particular judgment or decree is a joint one or made up of separate decrees, or, as Judge Severens puts it in Ayres v. Polsdorfer, 105 Fed. 737, 35 C. C. A. 24, "whether the judgment or decree was in legal contemplation a joint or several one, is," as he says, often a "dubious question," and "in solving it the courts have looked to its substance rather than its form." The controlling consideration in determining the question is to be gathered from his further statement in these words, to wit:

"In many cases the rule has been held not applicable where the party claiming to be aggrieved, although he is one of several parties against whom the judgment was rendered, yet alone represents some distinct and substantial subject-matter in which the others have no concern, or are only indirectly concerned by reason of the allowance or negation of the claim in question."

In the prior case of The New York, 104 Fed. 561, 44 C. C. A. 38, decided by this court, it was held that where a decree in admiralty had been rendered against the owner of a vessel and its surety in a stipulation entered into under Rev. St. § 941 [U. S. Comp. St. 1901, p. 692], and the admiralty rules for the release of a vessel for damages caused by a collision of said vessel with another vessel, it was not necessary for the surety to join in the appeal or to be severed, but that an appeal from the decree might be prosecuted by the owner of the vessel alone. Judge Lurton, in delivering the opinion of the court said:

"Such a stipulation stands in the place of the vessel, and its obligation is discharged by compliance with the order or decree of the court against the owner or claimant, and the liability may be enforced by a judgment thereon against both the principal and sureties at the time of rendering the decree in the original cause. The suit or controversy in this case was between the intervening owner or claimant of the New York and the libelant and others, intervening as cargo owners or cargo underwriters. To that controversy the surety upon the stipulation was not a party. Neither does the record indicate that any question arose touching the obligation of the surety company or in any way involving the terms of the stipulation bond. If any such question had been made, the surety would doubtless have a right to be heard and to take an appeal from any decree affecting its liability."

This case has peculiar applicability here. For, though said individuals were actual parties to the litigation in the lower court by their own amended bill as well as by the appellee bank's original bill, they were mere stakeholders, and they obtained the stake after the

beginning of the litigation and held it subject thereto. They had no concern or interest whatever in the question as to who was entitled to the lumber placed in their hands by the agreement of the contending parties. Their sole concern and interest was with the question as to how much they should account for because of the lumber that came into their hands. So much of the decree as adjudged that the appellee was entitled to the net proceeds of the lumber in their hands, as against the appellant was a separate decree from so much thereof as adjudged the amount of the net proceeds and that they should pay same to the appellee. It was not essential, therefore, for them to join in appellant's appeal or be severed therefrom. Nor was it essential that they be made respondents to the appeal. The fact that the person who should pay their commission depended upon who should be finally decided to be entitled to the proceeds in their hands did not give them such concern or interest in the questions carried up to this court by the appeal as to cause any different ruling. But it is not to be understood by our considering the question as to whether said individuals were necessary parties to this appeal that we think that there has not been what should be construed to be a severance if it were held that they were necessary parties thereto. The parties who it is claimed were necessary parties to appellant's appeal are the appellant himself and his former co-trustees as individuals. . In the lower court appellant and his former co-trustees both as trustees and individuals were represented by the same solicitors. Those solicitors appear here for appellant, and the appeal seems to have been taken and allowed in open court. In the case of Ayres v. Polsdorfer, supra, Judge Severens said: "Considerable liberality has been shown in regard to the method by which the severance is effected." The case of Johnson v. Trust Co. of America, 104 Fed. 174, 43 C. C. A. 458, is an illustration of such liberality. In view of this liberality, had appellant's co-trustees not resigned their trust before the decree, but had united with him as trustee in taking the appeal, it would have been open to claim that the right of appeal by them as individuals had been deserted; and, though they had resigned and did not unite, under the circumstances stated, claim of such desertion may still be urged. But it is not necessary that we determine this question. We refer to it simply to preclude any misunderstanding.

The motion to dismiss the appeal is, therefore, denied.

1. Coming to the merits of the appeal, we find that it is urged on behalf of the appellant that the appellee bank acquired no right or lien upon the lumber by virtue of the warehouse proceedings and the pledge of the warehouse receipts, and that therefore he was entitled to the full relief sought. It is so urged upon several grounds. In the original bill of the trustees it was charged that said proceedings and pledge were for the purpose of defrauding the creditors of the hardwood company and that both appellees knew of this fraudulent purpose and participated in it. Possibly the evidence would justify the conclusion that such was their purpose, but it discloses no warrant for the charge that either appellee knew of it or participated in it. One of the grounds upon which the position stated

is urged is that the lumber in question was not warehoused by those proceedings. Of course, an actual warehouse is not essential to the warehousing of goods. They may be warehoused upon a parcel of ground inclosed, or open, or partly so. And they may be warehoused upon what are the owner's premises at the time of the warehousing, and that, though they may then be on those premises and without changing their location thereon. The only thing essential to the warehousing of goods is that their possession be changed from that of their owner to that of the warehouseman. In any disputed case of warehousing like that in hand, then, the one thing to be understood in order to settle the dispute is what is essential to work a change of possession. That one thing is laid down by the Supreme Court of the United States in the recent case of Union Trust Company v. Wilson, 198 U. S. 534, 25 Sup. Ct. 766, 49 L. Ed. 1154, a case of warehousing on what was at the time the owner's premises, though in an actual warehouse. There the question was whether a wholesale dealer in leather had warehoused with a warehousing company in an actual warehouse of his own certain leather goods owned by him. He walled off a part of the basement of his place of business and let it to the warehousing company. There were doors to this part and padlocks bearing the name of the company which were kept locked and to which the company had the only keys. It had a key to the front door and access to the part let to it at all hours of day or night. No one else could get such access without breaking in. There were two signs on the outside stating in large letters that the premises were occupied by the company as a public warehouseman. It does not appear clearly whether those signs were on the outside of the building or only of the part walled off and let to the company. It would seem, however, that the latter was the case. The company received leather from the dealer into this place and issued its receipts therefor. It was a part of the contract of warehousing that the company was not to be liable for damage by fire, water, etc., and that the dealer assumed all risk of loss except from dishonesty of the company's servants. The dealer paid the expenses of the company in connection with storing the goods. The rent stipulated to be paid by the company was a nominal one, and it was to be paid for its services $20 a month for the first $10,000 worth of property or less and a dollar a month for each additional $1,000. The company, therefore, received this compensation for its services without a dollar of expense on its part beyond what it paid its servants, and without further responsibility than from their dishonesty. It was held that the leather had been warehoused and the transaction was upheld. Mr. Justice Holmes delivering the opinion of the court, said: "But there can be no doubt on the facts as stated, without more, that the company had possession of the goods." The general principle which he stated was applicable and determinative in all cases of disputed possession was this:

"When there is conscious control, the intent to exclude and the exclusion of others, with access to the place of custody as of right, these are all the elements of possession in the fullest sense."

In any case of disputed warehousing like the one in hand, therefore, the one thing that is essential to work a change of possession of the goods desired to be warehoused is for the warehouseman to acquire exclusive control thereof. How absolutely the acquisition of exclusive control was regarded as working such a change and effectually warehousing the goods desired to be warehoused is to be gathered from this further remark of Mr. Justice Holmes:

"If the goods had been in a place under the exclusive control of the company, even without the company's knowledge, they would have been in the company's possession."

· In the Wilson Case it was because the warehouse company had acquired exclusive control of the leather goods that it was held that they had been warehoused. And what settled that it had acquired such control is thus stated by Mr. Justice Holmes: "It had them under lock and key in a place to which it had a legal title and right of access by lease."

The correctness of appellant's contention here, therefore, depends upon the question whether the appellee storage company acquired exclusive control of the lumber by the warehousing proceedings heretofore set forth. By the lease from the hardwood company to it, assuming that the lease was its act and binding upon it, the appellee storage company acquired and had the legal title to the lumber yard and right of access thereto for the term of one year. It did not, however, put, or at any time have, the lumber yard under lock and key. In the nature of things, that was impossible, for the side next to the railroad was unfenced and exposed. It, therefore, did not acquire exclusive control over the lumber in the way in which such control was acquired in the Wilson Case. But that is not the only way in which one can acquire the exclusive control of goods. He can place them in the custody of another and station him where the goods are to assert control over them and prevent others from interfering with them. Such a way of acquiring control is as effectual as placing the goods under lock and key. That is what the appellee storage company did here. It placed them in the custody of Lewis, and stationed him at the lumber yard to assert control and prevent others from interfering with the lumber, taking from him a $5,000 bond with good surety for the faithful performance of his duties as custodian from July 13, 1901 to May 3, 1902. He was faithful to his trust. He was at the lumber yard every day during that time, Sundays as well as week days, in such capacity. The possession and control of the storage company through its custodian was recognized by the state receivers when they paid the appellee bank the invoiced value of certain of the piles of lumber and secured their release from the appellee storage company, through Lewis, the custodian. It had no occasion otherwise to assert its control during the custodianship. The control of the appellee storage company was also manifested by the signs placed at the four corners of the yard and the double tags fastened to each of the 369 piles of lumber. It is unimportant that at the time of his appointment as custodian he was the servant of the hardwood company and continued such after his appointment and received no other

pay than the wages paid him by the hardwood company until the appointment of the receivers in bankruptcy. It is well settled in cases of this sort that the warehouseman may acquire and hold exclusive control and possession of the goods in such a way and under such circumstances. Sumner v. Hamlet (Mass.) 12 Pick. 76; American Pig Iron & S. Co. v. German (Ala.) 28 South. 603, 85 Am. St. Rep. 21; First National Bank of Parkersburg v. Harknes, 42 W. Va. 156, 24 S. E. 548, 32 L. R. A. 408; Fidelity Ins. T. & S. D. Co. v. Roanoke (C. C.) 81 Fed. 439; Dunn v. Train, 125 Fed. 221, 60 C. C. A. 113. Nor did the fact that the sign of the American Hardwood Company was permitted to remain as it had been, nor the further fact that Miss Albright was permitted to remain in the office, in charge of it and over Lewis in hardwood company matters, to any extent affect the exclusive control which the appellee storage company had of the lumber through its custodian, Lewis. She had no charge or control over the lumber or over Lewis with reference thereto. It is immaterial whether in fact she knew that to this extent she had been superceded, though it is not probable that she did not know it. The hardwood company had power to take from her whatever control she had over the lumber or Lewis with reference thereto, and, if it authorized appellee storage company to take exclusive control, through Lewis, her control was taken from her, whether she knew of it or not. Whatever authority or control over the office or over Lewis was left to her did not affect the control of the storage company over the lumber.

Undoubtedly, adopting in part Mr. Justice Holmes' language in the Wilson Case, if there was an understanding between the parties different from what the forms gone through by them signified and they were intended to disguise that understanding, the transaction was invalid. But there is nothing in the evidence tending to show any such understanding. The forms gone through with represented the real intent, purpose, and understanding of the parties. Still further, it is true here, as in the Wilson Case, that the motive for warehousing, so far as the hardwood company was concerned, was to get the lumber represented by documents for convenience of pledging, rather than to get it stored. But, as Mr. Justice Holmes there said, "that was a lawful motive and did not invalidate his [its] acts if otherwise sufficient." Nor is it open to contention that after the warehouse proceedings were had conditions were such in and about the yard that the lumber gave credit to the hardwood company. There is no evidence that any creditor was misled thereby, and the testimony of Lewis is that the tagging on the pile or piles next to the office and those next to Thirteenth street were observable from the outside and attracted a great deal of attention. The evidence does not justify the inference that there was any effort at concealment. The only fact that smacks thereof is the tacking of the yellow cards at the four corners of the yard on the inside, instead of the outside, of the fence. But the testimony is that this was done to prevent their removal by mischievous persons. Mr. Justice Holmes in his opinion refers to cases in which the "exclusive power of the so-called bailee gradually tapers away," and also to other cases "in which the courts have held

as matter of law that there was no adequate bailment." He cites the cases of Tradesmen's National Bank v. Thomas Kent Mfg. Co., 186 Pa. 556, 40 Atl. 1018, 65 Am. St. Rep. 876; Drury v. Moors, 171 Mass. 252, 50 N. E. 618.

It may be well to refer briefly to the facts of these two cases. In the latter case the goods attempted to be warehoused were iron kept by the owner in a yard under lock and key some distance from the owner's place of business. The warehouseman had made the owner's bookkeeper his agent to keep possession of the property. The key to the yard was kept in the owner's office over the desk of the bookkeeper, but it was not suggested that "he held the key adversely to the owner" or that "he had any such relation to it that he could have sued for it if it had been carried off." In the former case the goods attempted to be warehoused were wool, and that in the owner's actual warehouse. The alleged warehouseman was a clerk of the owner. No lease was made to him of the premises or any part thereof. No storage charges were made by him. He had no sign of any kind anywhere to indicate his proprietorship of the wool, kept no office or desk in the warehouse or key of the premises, and he was rarely there, and left the whole charge, including the depositing and removal of the goods, to the servants of the owner. All he had was a book of blank warehouse receipts and the warehousing consisted simply of issuing warehouse receipts for the wool. This case presents no such state of facts as either of these two presents. And the conclusion we have reached in regard to it is strengthened by contrasting them with it.

Counsel for appellant cite quite a number of authorities in support of their proposition that the lumber was not effectually warehoused. They have all been considered, but it is not necessary to refer to any of them except the case of In re Rodgers, 125 Fed. 169, 60 C. C. A. 567, a decision of the Seventh Circuit Court of Appeals, which is specially relied on. In that case an attempted warehousing of seed on the owner's premises was held invalid; the court stating: "We find the actual possession and control of the property in dispute to have been in the bankrupt." There, there was an actual warehouse. The warehouse proceedings consisted of these things, to wit, a lease to the warehouseman, a tagging of the bags of seed, discoverable upon careful search, and a placing of small and obscure signs not likely to attract attention and most of them hidden behind the piles of bags of seed upon the different floors, indicating that the warehouseman controlled the premises, without any exterior sign. On the other hand, the owner occupied the premises as a place of business, maintaining an office with clerks to assist in the management of the business and porters to handle the seed, continuing to transact business there as he had formerly done. The warehouseman had no key to the premises. No representative of the warehouseman was kept on the premises, though one occasionally visited the premises and inspected the property in a sort of way, exercising no supervision or control that would prevent the bankrupt from doing with it as he would, and, as a matter of fact, he did do with it as he would,

not, however, with the knowledge of the warehouseman. The facts of the case are so strikingly different in certain important particulars from those of the one in hand as to make it not an authority against the conclusion reached here. It is true that Judge Jenkins, as affecting the validity of the warehousing relied on, referred to such facts as these, to wit, that the warehouseman had no premises upon which to store property, and the seed in question were stored on the owner's own premises, and that the warehouseman paid no rental for the premises and assumed no liability to the owner or any other responsibility except what the law imposed on it with respect to those advancing money on the faith of the warehouse receipts. It is hardly probable that he would have attached any value to these circumstances in the absence of the other facts of the case which show that the warehouseman did not have the exclusive control of the seed, but, in so far as the case may be treated as an authority attributing an invalidating effect to them, it must be considered as overthrown by the decision in the Wilson Case. It was cited by counsel in that case, but it is not referred to in the opinion. It had theretofore been reversed by the Supreme Court on the ground that the lower court was without jurisdiction in the case of First National Bank v. Chicago T. & T. Co., 198 U. S. 280, 25 Sup. Ct. 693, 49 L. Ed. 1051. There is nothing in the Tennessee statutes in relation to warehousemen affecting the validity of the warehouse transaction in question. They simply define warehousemen to be persons, etc., who shall receive cotton, etc., in store for hire, or who shall undertake to receive and take care of or sell the same for other persons, provide that no warehouse receipt shall be issued unless the property is in the custody of the warehouseman and in store, or upon the premises and under his control at the time of issuing the receipt, and provide as to their negotiability. Shannon's Code, §§ 2792, 2793, and 2796. In the case of Bank of Rome v. Haselton (Tenn.) 15 Lea, 216, the warehousing of goods upon the owner's premises by one engaged in the warehouse business was upheld.

Another ground upon which the position of appellant heretofore stated is urged is that the lease from the hardwood company to the appellee storage company, and the other steps taken on its behalf to warehouse the lumber and the pledging of the warehouse receipts with the appellee bank, were none of them the acts of the hardwood company. It is contended that said acts were the acts of Charles E. Corkran, the president and treasurer of the company, on its behalf, that he had no authority from the company so to act, and therefore they were not its acts. In support of this contention, the by-law hereinbefore quoted by which it was made the duty of the president to sign and execute all contracts in the name of the company and affix the seal of the company thereto when instructed so to do by the board is relied on, and it is said that the board of directors of the hardwood company never authorized any of said acts. It is further stated by appellant's counsel that the appellee knew of this particular by-law at the time it made the loan—that it was amongst the by-laws then exhibited to it as showing said Corkran's power to act on its be-

half. This is a mistake, as the only by-laws then exhibited to it or that it ever saw were the other by-laws hereinbefore quoted in relation to making and indorsing notes and drawing checks. Said Corkran at the time was both president and treasurer. It is not contended that he did not have power to borrow the money, execute the company's note therefor, and check against the proceeds placed to the company's credit in its name. Such power was clearly conferred on him by the by-laws. The contention is that he had no power to make the warehouse arrangement with the appellee storage company and execute the lease to it or to pledge the warehouse receipts to the appellee bank as security for the loan without being authorized so to do by the board of directors. The evidence introduced on behalf of the trustees did not come far short of showing that, according to the course of dealing of the hardwood company, said Corkran was empowered to do on behalf of the company anything he deemed proper. The directorship was subject to a called meeting on one day's notice by telegraph, and as a matter of fact a quorum of the directors was in Cincinnati July 15, 1901, the time when the warehouse transaction was completed and the loan and pledge of the warehouse receipts were made. It is true that the minutes of the meetings of the board of directors contains no reference to these transactions, but those minutes seem not to have recorded much else besides the resignations of officers and appointment of their successors, which were quite frequent. However, it is not necessary to determine definitely the extent of Corkran's authority in the particulars in question. Though his authority may have been defective in one or all of these particulars, it is not open to the hardwood company, or any one claiming through it, to take advantage of such defect. This is because the company received the fruits of the transaction. The proceeds of the $21,000 note and of the 11 indorsed notes were placed to the credit of the company with the appellee bank and checked therefrom in its name. The by-laws provided that the treasurer should deposit the funds in such bank as the president might select, and that either the president or treasurer might issue checks in the name of the company. When, therefore, the proceeds of the notes were placed to the credit of the company with the appellee bank by Corkran, who was both president and treasurer, and were paid out upon the company's checks drawn by him, it was by act of the company they were so deposited and withdrawn. It thereby received those proceeds. The fact that thereafter Corkran may have diverted the proceeds from the company to his own private use in no way affected the prior fact that the company received those proceeds from the appellee bank.

Still another ground upon which said position of appellant is urged is that the failure of the appellee storage company to pay the tax prescribed for the privilege of carrying on the business of a warehouseman in Tennessee invalidated the warehouse proceedings in question, so that no rights can be asserted by the appellee bank growing out of them. The fact that the tax was not paid in no way militates against the conclusion heretofore reached that the exclusive control and possession of the lumber was changed from that of the hardwood

company to that of the appellee storage company. It was so changed at the instance of the hardwood company in order that it might obtain warehouse receipts to pledge to raise money. To deny the validity of the warehouse receipts which it thus obtained and thereafter pledged to the appellee bank is to make the latter suffer for the wrongdoing of the appellee storage company to the benefit of those claiming under the hardwood company, at whose instance the warehousing was done. The point is not well taken. The only one affected by the failure to pay the tax was the appellee storage company. It thereby became liable to be punished by fine, and could not itself assert any rights growing out of the transaction. Counsel for appellant cite the following decisions of Tennessee as upholding their contention, to wit: Stevenson v. Ewing, 87 Tenn. 46, 9 S. W. 230; Cary Lombard Co. y. Thomas, 92 Tenn. 587, 22 S. W. 743; Singer Mfg. Co. v. Draper, 103 Tenn. 262, 52 S. W. 879; Harris v. Parker, 108 Tenn. 29, 64 S. W. 1087. But none of them bear counsel out. In each case the wrongdoer was asserting a right growing out of his alleged transaction. It was he alone that was denied relief. In the case of Chattanooga R. & C. R. Co. v. Evans, 66 Fed. 809, 14 C. C. A. 116, this court held that a statute of Tennessee declaring it wrongful for any foreign corporation to acquire property in the state without first complying with certain prescribed conditions, and declaring a penalty against any one violating the provisions, did not invalidate a purchase by a foreign corporation that had not complied with those conditions, but merely subjected the offender to the punishment prescribed.

2. It is urged, further, on behalf of appellant that the appellee bank was entitled to no greater share of the proceeds of the lumber in the hands of the stakeholders and held by them subject to this litigation than what was sufficient to pay the balance due upon the $21,000 note, after crediting thereon the sums received from the state receivers, and that all over and above that amount should have been adjudged to appellant. This position is also urged upon several grounds. One is that the pledge of the warehouse receipts is invalidated by section 67e of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 564, 565 [U. S. Comp. St. 1901, p. 3449]), wherein it provides that conveyances, etc., made within four months prior to the filing of the petition in bankruptcy, with intent to defraud creditors, shall be void. The pledge of the warehouse receipts was on July 15th and the petition was filed November 12th, so that the former was made within four months prior to the latter. Further, as heretofore indicated, the evidence probably justifies the inference that the pledge was made with intent to defraud creditors. It is contended that the pledge to the extent of the liability of the hardwood company upon its indorsement of the 11 notes discounted by it between July 17th and 24th is not within the exception of the provision in favor of purchasers in good faith and for a present fair consideration. Indeed, it is intimated that there was no pledge at all to that extent, because nothing was said at the time of discounting the 11 notes as to the warehouse receipts being treated as collateral security for the liability

which the hardwood company thereby came under to the appellee bank. But it was not essential that anything should have been said at that time upon the subject. The provision in the contract of pledge entered into when the $21,000 note was executed, that it should cover any liability thereafter contracted, was sufficient without more to create a pledge to secure this liability subsequently created. It is also intimated that the pledge was not in good faith. But the evidence clearly establishes good faith on the part of the bank. There is no evidence whatever to the contrary. The real contention as to the pledge to the extent of said liability as indorser not being within said exception, and hence invalidated by said provisions, is that to that extent it was not for a present fair consideration. This, however, cannot be maintained. The pledge to that extent was for a present fair consideration. The appellee bank parted with the money simultaneously with the contraction of the liability and the creation of the pledge to that extent.

Another ground is that there is no proof that any of said 11 notes was presented for payment at maturity and duly protested, so as to hold the hardwood company as indorser. It is alleged in the bill of the appellee bank that demand of payment was duly made at maturity in each instance and notice of nonpayment promptly given to the hardwood company, and each of the notes was duly protested for nonpayment. It is contended, however, that this allegation is not admitted in the answer, and, not being so, should have been proven. This, as well as the absence of strict proof of the allegation, may be conceded to be true. But the hardwood company was a party to the trust agreement with the North American Trust Company hereinbefore referred to, and introduced in evidence, and at the time the appellee bank executed it, December 18, 1901, all of said notes had matured. By said agreement said 11 notes were treated as part of the liability of said hardwood company and the amounts of the protest fees in each instance were given as a part of that liability. Besides, the officers of the appellee bank proved in a general way that the said notes were a part of the liability of the hardwood company to it. No objection was made to this general form of proof. Indeed, this point does not seem to have been made at all in the lower court, so that if the proof of the demand, notice of nonpayment, and protest were not sufficient, it is now too late to make it.

Still another ground is that the appellee bank, by executing said trust agreement and assigning the 11 notes indorsed by the hardwood company to the North American Trust Company, parted with all claims upon the lumber or its proceeds to the extent of said notes. The case of Johnson v. Smith, 11 Humph. (Tenn.) 396, is cited as supporting this contention. It was held in that case that the assignment by the pawnee of a debt secured by a pawn, unaccompanied by a delivery of the pawn or pledge, either actual or constructive, will not carry with it and vest in the assignee the lien upon the property. Of course, in such a case, the pawnee or pledgee has no longer any claim to the pledge. It is true that the creditors generally who executed that agreement assigned their claims to the North American Trust Company upon

the stipulation that they were to take the notes, preferred stock, and common stock of the new corporation to be formed by the creditors' committee to the extent of their claims in payment for them, and that said agreement was thereafter binding upon them, so that they had no further claim than to said notes, preferred stock, and common stock. But the execution of said agreement was qualified so far as the appellee bank was concerned. It was expressly provided that it was to retain its right to the proceeds of the lumber over and above what was necessary to pay the $21,000 note on account of the hardwood company's liability as indorser on the 11 notes, and that to the amount it so received it was not to be entitled to common stock of the new corporation. This must be held to qualify the assignment provided in said agreement so far as the appellee bank was concerned. To the extent of what it might receive from the proceeds of said lumber on account of said liability it did not assign its claims to said trust company. It retained in itself that much of the liability.

3. Finally, it is urged on behalf of the appellant that it was entitled to have certain amounts paid to it out of the proceeds of the lumber, and that the lower court should have adjudged them to it. One amount is the sum of $874.10, the loss which the state receivers sustained by securing the release of certain piles of lumber upon paying to the appellee bank their invoiced value and selling same. It is contended that the appellee bank's president testified that it agreed to make good any such deficiency. Such an agreement is not alleged in the amended bill and made the basis of the right to recover said sum. Nor have the trustees in bankruptcy any right to sue upon an agreement made with the state receivers, who should settle with the court that appointed them. Otherwise no right to this sum has been shown.

Another amount is the sum of $820.36, expenses incurred by the state receivers in connection with the lumber yard and the lumber. They were not paid by said receivers at the instance of the appellee bank or upon any agreement with it, and nothing is shown upon which the right to recover this sum can be maintained.

And still another amount is the sum of $992.20, the invoiced value of the piles of lumber released to the state receivers, which it is contended were sold by the stockholders under the agreement of May 3, 1902, and whose proceeds are in their hands. It is denied on behalf of appellee bank that such is the case. The burden of proof was upon the appellant to make this out. The matter was referred to a special master. He found that this burden was not sustained and the lower court confirmed his finding. There is no such clear showing that this finding was erroneous to warrant us in disturbing it.

The decree appealed from is affirmed.